1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

8

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
10
11

RODNEY KRALOVETZ,                    No. C 11-1552 JSW (PR)

12
              Petitioner,            **ORDER DENYING PETITION
                                     FOR WRIT OF HABEAS CORPUS**
13     v.                            **AND CERTIFICATE OF
                                     APPEALABILITY**
14  GROUNDS, Warden,

15              Respondent.
                                 /
16
17                          **INTRODUCTION**

18          Petitioner, a prisoner of the State of California, has filed a habeas corpus petition

19  pursuant to 28 U.S.C. § 2254 challenging the validity of his criminal conviction and

20  sentence in state court.  The Court ordered Respondent to show cause why the petition

21  should not be granted, directing Respondent to either file an answer or a motion to

22  dismiss.  Respondent filed a motion to dismiss the petition on the grounds that certain

23  claims were not exhausted.  Petitioner filed a habeas petition in the California Supreme

24  Court in order to exhaust his unexhausted claims, and the petition was denied.

25  Respondent was then ordered to answer the petition.  Respondent has filed an answer,

26  and Petitioner has filed a traverse.

27                          **BACKGROUND**

28          In 2007, Petitioner was convicted of two counts of forcible oral copulation, one

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   count of lewd acts on a child, and special allegations that Petitioner bound the victim.

2   *See* Cal. Pen. Code §§ 288(c), 288a(c).  The trial court sentenced him to two consecutive

3   terms of 15 years to life in state prison under California's "Three Strikes" laws.  *See id.*

4   §§ 667.61(b),(e), 667.6(d).  The California Court of Appeal affirmed the conviction in an

5   unpublished opinion that denied seven claims.  (Resp. Ex. E.)[1]  On January 26, 2009,

6   Petitioner filed a petition for review to the California Supreme Court, raising eight of the

7   38 claims[2] raised herein, specifically, Claims 26 and 31-37.  (Resp. Ex. F.)  The petition

8   for review was summarily denied on March 18, 2009.  (Resp. Ex. G.)

9        From 2009 to early 2010, Petitioner filed habeas petitions setting forth his 38

10   claims in all three levels of the California courts, and they were all denied.  (Resp. Ex.

11   H.)  After filing the instant petition on March 30, 2011, he filed another habeas petition

12   in the California Supreme Court on February 29, 2012, in order to exhaust the 30

13   unexhausted claims in his federal petition.  (Resp. Ex. J.)  That petition was summarily

14   denied on June 20, 2012.[3]   (Resp. Ex. L.)  In the meantime, on May 2, 2012, Petitioner

15   filed a habeas petition in the Santa Clara County Superior Court with two claims —

16   Claim 11 from the instant petition and another claim not raised here.  (Resp. Ex. K.)  The

17   court rejected Claim 11, and ordered to show the State to show cause on the other claim.

18   (Resp. Ex. M.)

19        The California Court of Appeal summarized the evidence presented at trial as

20

21        [1]Unless otherwise noted, citation to Respondent's exhibits are to the exhibits
22   lodged in support of his answer.  (Dkt. 18.)

23        [2]The claims are numbered Claims 1-39, but Claim 1 does not set forth an
     independent claim for relief.  It merely states that all of the claims are set forth
24   separately.  (*See* Dkt. 1; Attachment to Dkt. 16.)

25        [3]When Petitioner notified the Court that the California Supreme Court had
     denied that petition, he attached a new federal petition.  (Attachment to Dkt. 16.)  The
26   new petition only sets forth Claims 1-25, 27-30, and 38 from the original petition.
     (*Compare* Dkt. I *with* attachment to Dkt. 16.)  As Petitioner has not indicated that he
27   wishes to abandon the nine omitted claims (Claims 26, 31-37, and 39), and it is
     apparent from the answer and traverse both that they are exhausted and that Petitioner
28   is pursuing them, they are deemed incorporated into the new federal petition.  The
     operative petition is the new petition (Attachment to Dkt. 16) with Claims 26, 31-37
     and 39 from the original petition (Dkt. 1) incorporated.

follows:

**The Prosecution's Case**

**The Charged Offenses**

J.B. testified that his mother passed away in 1990, when he was seven years old, so he and his sister went to live with his grandmother. They lived near Camden Avenue and Blossom Hill Road in San Jose. J.B. started using alcohol, marijuana, and methamphetamine when he was about 13 or 14 years old. At the time, defendant was "just a friend from the neighborhood." J.B. first met defendant at a creek close to J.B.'s house where J.B. and his friends gathered to drink or smoke marijuana. Thereafter, J.B. saw defendant several times a week on a regular basis. Defendant provided methamphetamine to J.B. and his friends and sometimes provided marijuana and alcohol.

In the fall of 1997, when J.B. was 14, he ran away from home because his grandmother was going to have him tested for drugs and he knew that he would not test clean. At the time, defendant was living in his van, which he parked on the street in the neighborhood or behind a Cask and Flask Liquor Store that was a couple of miles away. The van "was like a small RV," which contained a bed. It had a driver's side door, a passenger door and a single door in the back, but its windows were all blacked out. J.B. packed some clothes in a backpack, paged defendant, and then met him by the creek. After J.B. and defendant talked there, J.B. left with defendant. The first thing they did was "get high." J.B. stayed in the van with defendant for a few weeks. J.B. could not say how long he stayed with defendant because J.B. used drugs the entire duration of his stay.[4]

For at least the first week of J.B.'s stay, nothing unusual happened. But then, while J.B. was on the bed in the van in the process of changing his clothes, and while he was naked except for a T-shirt, defendant quickly put shackles around J.B.'s ankles. J.B. was surprised. He wrapped a towel around himself and tried to get the shackles off, but he could not get them off. Defendant tried to make light of the situation as if it was a joke, but J.B. did not consider it a joke. J.B. asked defendant to take the shackles off him, but defendant said that he could not find the key. J.B. did not attempt to leave the van because he was afraid.

J.B. continued to use methamphetamine with defendant because he wanted to stay awake; he did not want to fall asleep "in that position." Although J.B. was able to stay awake for a number of days, at some point he did fall asleep. He awoke to find defendant on top of him and defendant's mouth on his penis. J.B. told defendant to stop and "told him to get off me." "[H]e got off me relatively quick," and "[s]aid that he couldn't help himself." Defendant told J.B. that he loved him and that he was sorry. J.B. did not try to leave because he was still afraid, still in the leg shackles, and still had no pants on. He was afraid of "[t]he whole situation that [he] was in, being locked up in the back of [defendant's] van." He was also ashamed and embarrassed, and he did not feel free to leave.

After a number of days, J.B. fell asleep again. He awoke to find defendant on top of him again and defendant's mouth on his penis "the same way." J.B. told defendant to stop and to get off him, "pushed him away, and he got off." Defendant was apologetic as before, and again told J.B. that he loved him. J.B.

---

[4]A missing person's police report indicated that J.B. left home on November 6, 1997, and returned home on December 22, 1997.

did not run or call for help because he was afraid. He continued to use drugs in an attempt to stay awake.

However, after a couple more days, J.B. fell asleep again. When he awoke, he was lying face down, defendant was lying was on top of him with no clothes on, and defendant's erect penis was between his buttocks. J.B. told defendant to stop and to get off of him. J.B. "fought him off" and "had to push him off." Defendant again told J.B. that he could not help himself, that he loved J.B., and that he was sorry. J.B. later awoke two more times to find defendant on top of him in the same manner.

J.B. does not know how much time passed between each of these incidents. During the entire time he was shackled, he did not leave the van even though it was not locked because he was afraid and ashamed. Defendant left the van to get them food. J.B. kept asking defendant to look for the key to the shackles and defendant kept saying that he could not find the key. Defendant finally bought a set of thumb cuffs which had a key that worked on the shackles. J.B. thought that the shackles had been on him for "maybe two weeks." During that time, J.B. could not and did not use a regular bathroom; when the shackles were not on him he was able to use bathrooms in parks and service stations. After defendant took the shackles off J.B., J.B. stayed with defendant for a period of time, approximately two weeks, during which time nothing of a sexual nature happened.

With money defendant gave him, J.B. eventually used a pay phone to call a friend. Defendant drove J.B. to a pre-arranged location where Kim, a woman who worked for J.B.'s grandmother, met him. After J.B. returned to his grandmother's home, he did not tell anybody what had happened to him. He had not tried to break out of the shackles, so he did not have any injuries as a result of the shackles. He was ashamed and humiliated about everything that had happened. He first disclosed what had happened a few years before defendant's trial. He told his wife and his wife encouraged him to contact the police.

San Jose Police Officer Thomas Navin testified that he made a traffic stop of defendant's van on or about the night of November 20, 1999. Inside the van with defendant were seven people between the ages of 14 and 19. The officer searched the van and found lockable leg shackles and thumb cuffs.

San Jose Police Officer Robert Labarbera testified that he interviewed defendant, who was born in March 1960, on November 15, 2005. Defendant said that he always tried to help as many youths as he could, especially those with drug abuse problems. He said that he had attempted to help over 500 children and that he believed that approximately 400 of them are no longer using drugs thanks to him. Defendant admitted that he owned leg shackles in the mid to late 1990s.

**The Uncharged Offenses**

J.S. testified that he met defendant around the time he started high school, which was in 1989. J.S. was 13 or 14 at that time and his father had just passed away. A childhood friend introduced him to defendant, and J.S. occasionally obtained marijuana and methamphetamine from defendant and used the drugs with him.

Defendant usually parked his van in front of his mother's house near Camden and Ross Avenues. J.S. spent one night in the van with defendant. During that night, after they had smoked some marijuana and while J.S. was

going to sleep, defendant reached over J.S.'s waist and put his hand up J.S.'s shirt and then down his pants. J.S. was shocked and afraid, and he immediately turned over on his stomach. Defendant took his hand away and did not say anything. J.S. got up and left early in the morning.

J.K. was 18 years old in 1999 when he was convicted of possession of drugs for sale and furnishing drugs to a minor.[5] J.K. met defendant in 1993 or 1994 at a creek in the area of Blossom Hill Road and Camden Avenue, where J.K. gathered with his friends. J.K. and his friends bought drugs from defendant, and they went with defendant to his van, used methamphetamine, and "h[u]ng out" with him. This continued, off and on, for a couple of years.

Defendant lived in his van, which he would park in front of various friends' houses, and J.K. spent the night in defendant's van on numerous occasions because he was a runaway. Once, when J.K. spent the night in the van, he awoke to find his pants unbuttoned and defendant stroking his penis. J.K. pushed defendant away and told him to stop. Defendant did not apologize. J.K. got up, zipped up his pants, and left the van. Defendant followed J.K, so he started running, trying to get away from defendant. Defendant caught J.K. and hit him across the back of the head. Defendant said, " 'Why did you leave? Why did you run? I love you. Come back. Don't leave me.' " J.K. ran to a store and called his mother. He did not tell his mother what had happened because he was afraid that she would not believe him. Somebody had done something similar to him on a prior occasion, and his mother had not believed him when he told her about it. His mother called the police, but he did not tell the police what had happened either. He first talked to the police about what had happened about one year before defendant's trial.

J.H. started high school in San Jose in 1994. He first met defendant some time in late 1994, when J.H. was at a liquor store with a friend and the friend called defendant. Defendant came, picked them up in his van, and drove them around for a while. A month or so later, J.H. started "hanging out" with defendant fairly regularly. At first they drank and smoked marijuana; later they used methamphetamine and other drugs.

J.H. stayed overnight in the van with defendant on several occasions. At first, defendant would roll over and cuddle up to him. J.H. just thought defendant was asleep and dreaming. Then one night J.H. passed out after being up for several days using methamphetamine. He awoke to find that defendant had put his legs over J.H.'s legs, pulled down J.H.'s pants, and was fondling J.H.'s penis. J.H. pushed defendant away and fell back asleep. He did not tell anybody about the incident when he awoke again because he was embarrassed. Defendant did the same thing the next night. He said, " 'You're the only one that I've ever done this to. I love you. You're special.' " J.H. did not tell anybody about this incident either, for the same reason. Several additional incidents occurred within the next week or so. However, one incident happened about a month or two later.

J.H. had stopped "hanging out" with defendant for a while, but on this occasion he took LSD with some friends and decided to smoke marijuana in defendant's van with him. J.H. fell asleep after doing so, and awoke to find defendant performing oral sex on him. J.H. "pretty much froze[ ] in fear"; he could not leave because he was intoxicated and had nowhere to go. Defendant

_____

[5]The jury was informed that J.K. was in custody on new charges at the time he testified, but they were not told what the new charges were.

United States District Court

For the Northern District of California

continued for 10 or 15 minutes, and then stopped and said, " 'You're too scared to even get off.' " J.H. went back to sleep.

K.L., who was born in 1983, testified that he met defendant at the McDonald's at Camden and Leigh Avenue in late 1997. Defendant asked K.L. if he smoked marijuana. When K.L. answered affirmatively, defendant told him that if he ever wanted to smoke marijuana, he could meet defendant at his van behind a nearby liquor store. K.L. took defendant up on his offer that same evening. J.B., who K.L. knew from school, was in defendant's van at the time. Thereafter, K.L. frequently spent time driving around and smoking marijuana with defendant, but K.L. never used methamphetamine. Other people from K.L.'s school, besides J.B., "hung out with" defendant as well. Defendant went to jail in June 1998, and K.L. spent most of his time with defendant after defendant was released from custody some time in the summer of 1998.

K.L. stayed overnight in defendant's van five or six times, the last time on November 13, 1999, when the van was parked outside a friend's house. K.L. slept fully dressed in the same bed as defendant, and awoke to find his pants unzipped and defendant's hand around his penis. K.L. was lying on his side with his back to defendant's stomach. K.L. pulled defendant's hand away, zipped up his pants, and tried to get up, but defendant put his hand around K.L.'s stomach and pulled K.L. closer to him. K.L. was afraid because defendant would not let him leave. K.L. tried to pull himself away from defendant a few times while defendant pretended to be asleep. After about five minutes, K.L. got defendant's hand free, left the van, and went inside his friend's house. He did not tell his friend what had happened because he was afraid. The next day, K.L. went to work with defendant.

San Jose Police Officer Richard Lira testified that on March 26, 1998, he conducted a probation search of defendant, after which he took defendant into custody. Defendant was under the influence of methamphetamine and had methamphetamine on his person. The parties stipulated that on June 18, 1998, defendant pleaded guilty to possession of methamphetamine and being under the influence of a controlled substance as a result of his arrest on March 26, 1998.

Officer Labarbera testified that when he first mentioned J.B.'s name to defendant during the November 2005 interview, defendant recognized the name but responded to questions as though he was talking about a different person. The officer then clarified that defendant was talking about J.K. rather than J.B.[6] Defendant talked about K.L., and said that K.L. had falsely accused him because defendant had embarrassed K.L. in front of some friends. Defendant also talked about J.S., but without mentioning his last name.

**The Defense Case**

Santa Clara County Sheriff's Deputy Keith Randall testified that, for officer safety reasons, he places leg shackles on a prisoner from behind the prisoner. Otherwise, the prisoner could hit or kick him, causing injury. He also double locks the shackles. Unless he does so, the shackles tighten every time they are hit against something. If the shackles tighten, they can cause redness and swelling. Even if the shackles are double locked, they can cause redness if they are kept on for eight hours.

Thomas Zimmerman testified that he has known defendant since they both

---

[6]J.B. and J.K. have the same first name.

6

were in junior high school. In 1997, defendant was working as a driver for a transportation company when he told Zimmerman about an opening with the company. Zimmerman began working for the company in late 1997 or early 1998. At the time, defendant had a small camper-style van that he often parked in front of his mother's house, or at the house of their friend Chris Owen, who lived around Camden and Leigh Avenues behind a Cask and Flask liquor store. During the 10 to 15 times Zimmerman saw defendant's van in late 1997 and early 1998, Zimmerman never saw any juveniles in or around the van and never saw defendant using or dealing drugs.

Cathy Silas testified that she has known Zimmerman since elementary school and defendant since high school. She met Owen in 1977. In the fall of 1997, defendant lived in a small van which he parked by Owen's property. Silas never saw children around the van and never heard any children inside the van.

Kimberly Bangerter testified that from 1995 to 2000, she worked for J.B.'s grandmother. She knew J.B. fairly well. J.B. ran away from home in the fall of 1997. During that time, he called his grandmother's office a couple of times and Bangerter begged J.B. to come home. After one of J.B.'s calls, Bangerter arranged to pick J.B. up at a shopping center. She and J.B.'s grandmother drove to the center in separate vehicles. Defendant was with J.B. when Bangerter arrived, which was the first time Bangerter met defendant. J.B. looked tired, but he did not say anything about being held captive. Defendant left, J.B.'s grandmother arrived, and J.B. went home with his grandmother.

Defendant testified in his own behalf that he did not put shackles on J.B., did not hold J.B. captive in his van, did not orally copulate J.B., and did not rub his erect penis on J.B.'s back side. Although defendant owned leg shackles in 1999, he did not have them in 1997.

In late 1996 or early 1997, defendant bought a van that held a refrigerator, stove, sink, couch and bed. He lived in the van in the fall of 1997, and parked it at Owen's house. Although he had a history of drug abuse, starting when he was 16 years old, he stopped using drugs on August 19, 1997.

Defendant met J.B. through J.B.'s sister. J.B. ran away from home in November 1997, and spent the first night in defendant's van. Defendant dropped J.B. off at a bowling alley the next morning. Thereafter, defendant communicated with J.B., both on the telephone and in person, but J.B. did not spend another night in defendant's van. Defendant did not provide or use drugs with J.B. He tried to get J.B. to quit using methamphetamine and marijuana and to go home. Finally, defendant got J.B. to call Bangerter. Defendant and J.B. first met Bangerter at a restaurant. Then defendant took J.B. to buy a Christmas present for his grandmother before meeting Bangerter again at J.B.'s grandmother's house. Defendant left after J.B. went inside the house. Defendant saw J.B. numerous times after that.

Defendant used drugs with J.S. and other members of J.S.'s family in 1988 and 1989. One night, defendant and J.S. were in defendant's van after getting high on marijuana. Defendant fell asleep and awoke when J.S. pushed defendant's hand off of his waist. J.S. said that defendant had reached over and hugged him. Defendant apologized and J.S. never brought it up again. Defendant denied having had his hand around J.S. and denied touching J.S.'s penis.

Defendant also used drugs with J.K. J.K. lived with defendant in his van for about three months because J.K. was a runaway, and defendant bought him

food and clothing. One morning defendant awoke to find J.K. kissing him. Defendant pushed J.K. away and explained that he did not want anything in return for helping J.K. J.K. ran from the van 10 to 15 minutes later. Defendant ran after J.K. because defendant was afraid that J.K. was going to do something stupid. He did not hit J.K. He told J.K. that he needed to go home. J.K. agreed, so they called J.K.'s mother, she called the police, defendant talked with J.K.'s mother and the police when they arrived, and J.K. left with his mother.

Defendant knows J.H. through defendant's sister, and he used drugs with J.H., but J.H. never lived or stayed the night with defendant in his van, and defendant never touched J.H. inappropriately.

Defendant met K.L. at a McDonald's one night, and thereafter used drugs with him. To his knowledge, he never touched K.L. inappropriately. Defendant was asleep the entire time he was in his van with K.L. and could not say what happened while he was asleep.

Defendant acknowledged that he previously pleaded no contest to allegations that between October 1, 1999, and November 13, 1999, he kissed a 16-year-old boy on the lips;[7] that he fondled K.L. on November 13, 1999; and that on five occasions in October and November 1999 he provided narcotics to a minor. Defendant also acknowledged that he was found under the influence and in possession of methamphetamine on March 26, 1998, but he testified that it was because J.S.'s girlfriend put methamphetamine into his soft drink without his knowledge.

**Verdicts and Sentencing**

On April 18, 2007, the jury found defendant guilty of two counts of forcible oral copulation (§ 288a, subd. (c); counts 1 & 2), and found true the special allegations as to both counts that defendant "tied or bound [J.B.], and that [J.B.] was tied or bound when" the offenses were committed. The jury further found defendant guilty of lewd acts on a child aged 14 or 15 (§ 288, subd. (c); count 3). On June 29, 2007, the court sentenced defendant to consecutive terms of 15 years to life on counts 1 and 2 pursuant to section 667.6, subdivision (d), and California Rules of Court, rules 4.425(a)(2) and (a)(3). The court imposed a concurrent term of two years on count 3.

*People v. Kralovetz*, No. H031894, slip op. 1, 2-12 (Cal. Ct. App. Dec. 15, 2008)

(renumbered footnotes in original) (Resp. Ex. E).

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

[7]The victim of these allegations did not testify at defendant's trial.

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider AEDPA's standard for relief has been met, the Court looks to the last state court to deny the claims in an explained opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). For the eight claims discussed on their merits below, the last explained state court opinion is the California Court of Appeal's affirmance on direct appeal. (Resp. Ex. E.) The remaining claims have only been summarily denied.

9

**DISCUSSION**

A.    Procedural Default

Respondent argues that 30 of the claims (Claims 2-25, 27-30, and 38-39) are procedurally defaulted from federal habeas review because the California Supreme Court denied them as untimely.  Petitioner did not raise these claims on direct review.  Instead, he raised them in a habeas petition to the California Supreme Court in 2010, and then he raised them again , but instead he raised them in two habeas petitions in the California Supreme Court in 2010 and 2012.  (*See* Resp. Exs. F, H, J.)

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  California's timeliness rule is both independent and adequate, *Walker v. Martin*, 131 S. Ct. 1120, 1131 (2011); *Bennett v. Mueller*, 322 F.3d 573, 582-83 (9th Cir. 2003), such that when a California court denies a claim as untimely, the claim is procedurally defaulted from federal habeas review.

The California Supreme Court initially denied these 30 claims in 2010 because they were not presented sufficient particularity.[8]  (Resp. Ex. I.)  California law allows this defect to be cured in a renewed state petition.  *See Kim v. Villalobos*, 799 F.2d 1317, 1319 (9th Cir. 1986).  Petitioner renewed the claims in a second habeas petition to the California Supreme Court in 2012.  That petition was denied in a summary order with citations to *In re Robbins*, 18 Cal. 4th 770, 780 (1998), *People v. Duvall*, 9 Cal. 4th 464, 474 (1995), *Ex parte Swain*, 34 Cal. 2d 300, 304 (1949), and *In re Miller*, 17 Cal. 2d 734, 735 (1941).  (Resp. Ex. L.)  When, as here, the California Supreme Court denies a habeas petition without comment but with citation to *Robbins* at 18 Cal. 4th at 780, which is the page where the decision discusses California law's analytical framework for

---

[8]This is explained in the order granting Respondent's motion to dismiss.  (Dkt. no. 11 at 3-4.)  The petition was also denied because it also included the eight claims that had already been rejected on direct appeal.  (Resp. Ex. I (*citing* In re Waltreus, 62 Cal. 2d 218 (1965)).

United States District Court

For the Northern District of California

1   timeliness determinations, the denial is on untimeliness grounds.  *See Thorson v. Palmer,*
2   479 F.3d 643, 645 (9th Cir. 2007).  Because the 2012 Supreme Court habeas petition was
3   denied with a citation to *Robbins*, 18 Cal.4th at 780, the 30 claims in that petition
4   (Claims 2-25, 27-30 and 38-39 in the instant petition) are considered to have been denied
5   as untimely.

6           The California Supreme Court's citation to additional cases in addition to *Robbins*
7   does not alter this conclusion, but simply indicates that there were other procedural
8   defects in addition to untimeliness.  *See*, *e.g.*, *In re Miller*, 17 Cal. 2d 734, 735 (1941)
9   (discussing state rule against repetitious presentation of claims already presented in an
10  earlier petition).  Citations to *Swain* and *Duvall* on their own would not necessarily
11  indicate that the denial was for untimeliness, *Cross v. Sisto*, 676 F.3d 1172, 1178 (9th
12  Cir. 2012), but because the court also cited the untimeliness discussion in *Robbins*,
13  whatever else was wrong with the petition, the California Supreme Court considered it
14  untimely, *compare id.* (finding California Supreme Court's citations to *Swain* and *Duvall*
15  on their own does not necessarily mean the denial is based on untimeliness, where there
16  was no citation to *Robbins*).  Because the California Supreme Court denied the 30 claims
17  as untimely, they are procedurally defaulted from federal habeas review under *Walker*
18  and *Bennett*.

19          There are exceptions to procedural default where Petitioner can show cause and
20  prejudice for the default or a fundamental miscarriage of justice.  *See Coleman v.*
21  *Thompson*, 501 U.S. 722, 750 (1991).  Petitioner argues that his 2012 habeas petition to
22  the California Supreme Court should not have been found untimely, but that is a
23  determination of state law made by the state high court, not by the federal court.  *See*
24  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (state court's interpretation of state law
25  binds a federal court sitting in habeas corpus); *see also Sandstrom v. Montana*, 442 U.S.
26  510, 516-17 (1979) (the state's highest court is the final authority on the law of that
27  state).  Petitioner also states that he filed his claim when he learned of the decision in
28  *Lafler v. Cooper*, 132 S.Ct. 1376 (2012).  The claims in the 2012 state habeas petition

1  are not based on *Lafler*, however, nor are any of the claims in the instant petition.

2  Petitioner has not shown that there is an exception to the procedural default of his

3  claims, nor does any such exception appear from the record.

4  B.    Insufficient Evidence

5        In Claims 31 and 32, Petitioner claims that there was insufficient evidence to

6  support his conviction on two counts of forcible oral copulation.[9]  *See* Cal. Pen. Code §

7  288a(c).  In Claim 35, he asserts that there was insufficient evidence to support the

8  sentence enhancement for tying or binding the victim "in the commission of" the two

9  oral copulations.  *See* Cal. Pen. Code. § 667.61(e)(6); CALCRIM No. 3182; Resp. Ex. E

10  at 23-24.

11        The Due Process Clause "protects the accused against conviction except upon

12  proof beyond a reasonable doubt of every fact necessary to constitute the crime with

13  which he is charged." *In re Winship,* 397 U.S. 358, 364 (1970).  A state prisoner who

14  alleges that the evidence in support of his state conviction cannot be fairly characterized

15  as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt

16  therefore states a constitutional claim which, if proven, entitles him to federal habeas

17  relief. *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

18        The Supreme Court has emphasized that "*Jackson* claims face a high bar in

19  federal habeas proceedings. . .." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per

20  curiam).  A federal court reviewing collaterally a state court conviction does not

21  determine whether it is satisfied that the evidence established guilt beyond a reasonable

22  doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court determines

23  only whether, "after viewing the evidence in the light most favorable to the prosecution,

24  any rational trier of fact could have found the essential elements of the crime beyond a

25  reasonable doubt." *Jackson*, 443 U.S. at 319.  Only if no rational trier of fact could have

26  found proof of guilt beyond a reasonable doubt, has there been a due process violation.

27

28        [9]Petitioner argues that because of the insufficient evidence, these counts should
have been reduced to lesser-included offenses.

United States District Court

For the Northern District of California

1    *Id.* at 324.

2           The California Court of Appeal reasonably found sufficient evidence to support

3    the convictions for forcible oral copulation.  (Resp. Ex. E at 13-15.)  Petitioner argues

4    that there was insufficient evidence that he used "force, violence, duress, menace or fear

5    of immediate and unlawful bodily injury to anyone," an essential element of the offense.

6    *See* Cal. Pen. Code § 288a(c); CALCRIM No. 1015; Resp. Ex. E at 12-13.  The

7    California Court of Appeal found that the jury could have reasonably found that

8    Petitioner used force, duress, and/or fear.  (Resp. Ex. E at 14-15.)  The state court is

9    correct that a jury could reasonably conclude that the evidence that Petitioner shackled

10   J.B. for two weeks against his will constituted the use of physical force.  (*Id.* at 13-14

11   (quoting prosecutor's argument).)

12          A jury could also reasonably find that J.B. was under duress.  The Court

13   explained that, under California law, duress may be found where there is psychological

14   coercion with an "implied threat of force, violence, danger, hardship or retribution."  (*Id.*

15   at 14 (internal quotations and citations omitted)).  The totality of the circumstances may

16   be considered, including the relative age and size of the victim and perpetrator, in

17   determining whether there was an implied threat.  (*Id.*)  The jury could reasonably

18   conclude that by shackling J.B. while he was half-naked and asleep, and then not

19   releasing him for two weeks, Petitioner implied a threat that he might physically harm

20   J.B. or seek retribution if J.B. did not comply with the copulation.  In addition, Petitioner

21   was much older and bigger than J.B., he made advances when J.B. was asleep and under

22   the influence of drugs that he supplied to J.B., he repeated the advances after J.B.

23   stopped him, and he knew that J.B. feared getting in trouble with his family if they

24   learned he was with Petitioner in the van and using drugs.  These circumstances could

25   reasonably be viewed as making J.B. feel under threat of further hardship, harm or

26   retribution if he did not go along with Petitioner.

27          Petitioner argues that the jury could not reasonably find force or duress because

28   J.B. was asleep when copulation took place and was able to ward off Petitioner without a

United States District Court
For the Northern District of California

13

United States District Court

For the Northern District of California

1   struggle when he awoke.  These circumstances do not negate the fact that Petitioner used

2   physical force to shackle J.B., and then copulated J.B. when he was asleep, half-naked,

3   and on drugs.  The fact that J.B. stopped the copulation does not mean there was no force

4   or duress applied.  The jury could simply conclude that J.B. overcame the force and

5   duress arising from the shackles and other circumstances described above.  Petitioner

6   also argues that there could not have been any force, fear or duress because J.B. could

7   have left the van while shackled but he did not do so.  Even though J.B. could have left

8   the van, Petitioner could still have forcibly orally copulated him on two occasions during

9   the six weeks J.B. was there.  It is certainly possible to be force a victim to do something

10  while they are in a house, car, van or other place that they could eventually leave.

11  Petitioner also argues that the shackles cannot be viewed as the use of force because it is

12  possible to consent to being shackled and because the shackling occurred separately

13  from the oral copulation.  First, the evidence showed that while a person could

14  theoretically consent to shackles, in this case there was evidence that J.B. did not consent

15  and demanded they be removed.  Second, although Petitioner applied the shackles days

16  before he copulated J.B., J.B. was still in the shackles against his will when the

17  copulations took place.  The jury could reasonably view this as a continued application

18  of force.

19          The California Court of Appeal also reasonably rejected the claim that there was

20  insufficient evidence to support the sentence enhancement for tying or binding the victim

21  "in the commission of" the two oral copulations.  *See* Cal. Pen. Code. § 667.61(e)(6);

22  CALCRIM No. 3182; Resp. Ex. E at 23-26.  Petitioner argued to the California Court of

23  Appeal, as he does here, that J.B.'s testimony indicated that Petitioner shackled him

24  between several days to more than a week before orally copulating him.  Petitioner

25  asserts that this is too remote in time to mean that he shackled him "in the commission"

26  of the copulations under California Penal Code Section 667.61(e)(6).  The California

27  Court of Appeal held that under California law, the phrase "in the commission of" has a

28  broad construction, such that the Section 667.61(e)(6) applies as long as the tying or

United States District Court

For the Northern District of California

1   binding occurred "before, during, or after the completion of the underlying offenses."

2   (Resp. Ex. E at 25 (discussing California case law).)  Therefore, unde state law, that

3   Petitioner fell within the sentence enhancement as long as he shackled J.B. "some time

4   before committing the oral copulation, and J.B. was still shackled at the time of those

5   offenses."  (Resp. Ex. E at 25.)  This construction of California law is binding on this

6   Court conducting habeas review of his conviction, *see Hicks v. Feiock*, 485 U.S. 624,

7   629-30 & n.3 (1988), and there was certainly sufficient evidence for a reasonaly jury to

8   find that Petitioner shackled J.B. and that J.B. was still shackled when Petitioner orally

9   copulated him.

10      There was sufficient evidence for the jury to conclude beyond a reasonable doubt

11   that Petitioner used force or duress when he orally copulated J.B., and that J.B. was tied

12   or bound "in the commission of" those offenses within the meaning of California Penal

13   Code Section 667.61(e)(6).  Accordingly, the California Court of Appeal's denial of

14   Petitioner's claims of insufficient evidence was neither contrary to nor an unreasonable

15   application of federal law.

16   C.    <u>Lesser-Included Offense Instructions</u>

17      Petitioner claims that the trial court violated his Sixth and Fourteenth Amendment

18   rights by failing to instruct the jury on the lesser-included offenses of battery and non-

19   forcible oral copulation with a minor.  The failure of a state trial court to instruct on

20   lesser-included offenses in a non-capital case does not present a federal constitutional

21   claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).  It is true that "the

22   defendant's right to adequate jury instructions on his or her theory of the case might, in

23   some cases, constitute an exception to the general rule." *Id.*  But in this case the defense

24   theory was that Petitioner had not confined, injured or orally copulated J.B. at all, not

25   that Petitioner had committed a lesser-included offense.  Therefore there is no exception

26   to *Solis* here providing Petitioner a constitutional right to instructions on lesser-included

27   offenses. The denial of this claim was neither contrary to nor an unreasonable

28   application of federal law.

D.      Amended Information

In Claim 26, Petitioner argues that the prosecutor violated his due process right to be free from vindictive prosecution.  The vindictiveness occurred, according to Petitioner, when the prosecutor added the sentence enhancement allegations for tying and binding the victim, which occurred after Petitioner rejected the prosecutor's plea offer.  *See* Cal. Pen. Code § 667.61(e)(6).  In Claim 34, Petitioner asserts that by allowing the prosecutor to so amend the information, the trial court violated his due process right to notice and to make an informed decision during plea bargaining.

The California Court of Appeal summarized the facts surrounding the amendment of the information as follows:

> The first time J.B. spoke to an officer about defendant's offenses was in May 2005. J.B. told the officer at that time that he had been shackled. The officer interviewed defendant in November 2005, during which time defendant admitted that he owned leg shackles in the mid to late 1990s. The felony complaint filed in December 2005 charged defendant with three counts of forcible oral copulation, but it did not include allegations that defendant engaged in the tying or binding of J.B. in the commission of the offenses. (*See* § 667.61, subds. (b) & (e)(6).) Defendant faced a possible maximum sentence of 24 years in state prison if convicted of all three counts charged in the felony complaint.
>
> The preliminary examination was held on August 28, 2006, during which J.B. testified that he was shackled during the commission of defendant's sexual offenses. Following the hearing, the magistrate found probable cause to charge defendant with two counts of forcible oral copulation. The information filed on September 8, 2006, charged defendant with two counts of forcible oral copulation, again without allegations that defendant engaged in the tying or binding of J.B. in the commission of the offenses, and one count of lewd acts on a child of 14 years. Defendant was arraigned on the information and entered a not guilty plea on September 11, 2006. At the time, he faced a possible maximum sentence of 21 years in state prison if convicted on all counts of the information.
>
> In November 2006, the prosecutor filed motions to amend the information to add special allegations of tying or binding during the commission of the forcible oral offenses. (§ 667.61, subds.(b) & (e).) Defendant filed opposition to the motions, arguing in part that the proposed amendments violated his right to due process as "[t]he prospect of an enhancement under P.C. 667.61 was not raised during plea negotiations and was not raised at preliminary examination or in the information." At a hearing on January 12, 2007, defendant contended that the failure to include the tying and binding allegations in the complaint and information affected the plea bargaining in the case. The trial court granted the motion to amend, finding that the motion "is properly brought." The amended information, which was filed the same day as the hearing, subjected defendant to two consecutive terms of 15 years to life. On

16

1    January 17, 2007, the court granted defendant's motion for a continuance,
2    and the trial began on March 27, 2007, with discussions on motions in
     limine.

3    (Resp. Ex. E at 18-19.)

4          The plea negotiations alluded to took place in June 2006, after the complaint was

5    filed but two months before the preliminary hearing.  (Resp. Ex. A at 136.)  At that time,

6    Petitioner was facing three counts of forcible oral copulation with a maximum sentence

7    of 24 years in state prison.  (*Id.*)  The prosecutor offered him an 18-year sentence in

8    exchange for a guilty plea on three charges of felony oral copulation, and the superior

9    court offered him a 12-year sentence if he plead guilty.  (*Id.*)  Petitioner declined the

10   offer.  (*Id.*)

11         The California Court of Appeal reasonably denied the claim that the prosecutor

12   added the sentence enhancement vindictively to punish Petitioner for not accepting the

13   plea offer.  A prosecutor violates a defendant's due process rights when he brings

14   additional charges solely to punish the defendant for exercising a constitutional or

15   statutory right.  *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  The defendant has

16   the burden to show that "charges of increased severity were filed because the accused

17   exercised a statutory, procedural, or constitutional right in circumstances that give rise to

18   an appearance of vindictiveness."  *United States v. Gallegos-Curiel*, 681 F.2d 1164,

19   1168 (9th Cir. 1982).  The defendant must show that the prosecutorial conduct would not

20   have occurred "but for" the prosecutor's "hostility or punitive animus towards the

21   defendant because he has exercised his specific legal rights."  *Id.* at 1168-69.

22         Petitioner has not supplied any evidence of actual vindictiveness or animus, or

23   that prosecutor amended the information because of the rejected the plea offer.  Indeed,

24   the only evidence of the prosecutor's reason for adding the enhancement when she did is

25   her testimony that she waited until after the preliminary hearing because she wanted to

26   wait until she heard what J.B.'s testimony would be.  (Resp. Ex. E at 22.)  Petitioner's

27   claim is based solely on the prosecutor amending the information after plea negotiations

28   broke down.  The mere fact that a defendant refuses to plead guilty is insufficient to

United States District Court
For the Northern District of California

17

United States District Court

For the Northern District of California

1    warrant a presumption that subsequent changes to the charges were unjustified, however.

2    *United States v. Goodwin*, 457 U.S. 3 8, 382-83 (1982).  Indeed, the fact that the

3    prosecutor amended the information after the preliminary hearing tends to bolster her

4    testimony that she added the enhancement based on the preliminary hearing testimony.

5    In any event, under *Goodwin*, the mere fact that Petitioner refused the plea offer and

6    insisted on going to trial does not, on its own, warrant a presumption that the prosecutor

7    later added the sentence enhancement to the information out of vindictiveness.  As there

8    is no other evidence of vindictiveness, this claim fails.

9         The California Court of Appeal also reasonably found that the trial court did not

10   violate Petitioner's constitutional right to adequate notice of the charges by allowing the

11   prosecutor to amend the information.  A criminal defendant has a Sixth Amendment

12   right to be informed of any charges against him, and a charging document, such as an

13   information, is the means by which such notice is provided.  *Gautt v. Lewis*, 489 F.3d

14   993, 1003-04 (9th Cir. 2007) (citing *Cole v. Arksansas*, 333 U.S. 196, 201 (1948)).  To

15   determine whether a defendant has received fair notice of the charges against him, the

16   court looks first to the information.  *James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994).  The

17   principal purpose of the information is to provide the defendant with a description of the

18   charges against him in sufficient detail to enable him to prepare a defense.  *Id.*

19        There is no dispute that the amended information described the crimes in

20   sufficient detail.  Nor is there any indication that Petitioner did not have adequate notice

21   or opportunity to prepare his defense.  After allowing the amendment, the trial court gave

22   Petitioner an additional two months to prepare for trial.   This was more than sufficient

23   because the shackling was neither a novel or complex matter in the case.  J.B. had

24   already testified at the preliminary hearing to being shackled when Petitioner orally

25   copulated him.  Petitioner's defense to this allegation did not require substantial

26   investigation or preparation because his defense was simply that he did not do it.  As the

27   state appellate court reasonably concluded, Petitioner's constitutional right to notice of

28   the charges was not violated because he had sufficient time and opportunity to prepare

his defense against the charges after the information was amended.

Petitioner also argues that allowing the prosecutor to add the sentence enhancement charge violated his due process right to make an informed decision about the plea offer because at the time of the plea negotiations, the sentence enhancement, which considerably increased his exposure, was not charged.  Petitioner has cited no Supreme Court authority, and this Court is aware of none, providing that the federal constitutional right to due process guarantees a defendant full information about all the charges they will eventually face at trial when they are undergoing plea negotiations.  Under AEDPA, federal habeas relief is only available on the basis of "clearly established Federal Law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  The dicta cited by Petitioner from *Bordenkircher v. Hayes*, 434 U.S. at 363-64, does not create the due process right that Petitioner asserts, nor can such dicta in any event be the source of federal habeas relief, *see Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions").  If anything, the holding in *Goodwin* that due process is not violated simply because the prosecutor changes the charges after plea negotiations suggests that due process does not require a defendant be informed of all of the charges he faces at trial when he conducts plea negotiations.  In any event, the lack of "clearly established federal law" supporting this argument precludes granting habeas relief under AEDPA.

Accordingly, Petitioner is not entitled to habeas relief on these claims.

E.     Verdict Forms

In Claim 36 Petitioner argues that the verdict forms for the sentence enhancement for engaging in tying or binding the victim in the commission of the oral copulations (Cal. Pen. Code § 667.61(e)(6)) violated his right to due process.  He complains that the forms asked the jury to find whether "defendant tied or bound Joshua B. and that Joshua B. was tied or bound when crime was committed."  (Resp. Ex. B at 402-04.)  He argues that this language violates due process because it differs from the sentence enhancement

19

United States District Court

For the Northern District of California

1  statute, which requires the defendant "engaged in the tying or binding . . . during the

2  commission" of the sex offenses."  Cal. Pen. Code § 667.61(e)(6).

3  Due process requires proof beyond a reasonable doubt of every element of an

4  offense.  *In re Winship*, 397 U.S. 358, 364 (1970).  A verdict form is the functional

5  equivalent of a jury instruction, *see United States v. Reed*, 147 F.3d 1178, 1180-82 (9th

6  Cir. 1998), and if a jury instruction reduces the level of proof necessary for the

7  prosecutor to carry its burden by failing to properly instruct the jury on the elements of

8  an offense, then the instruction violates due process.  *See Yates v. Evatt*, 500 U.S. 391,

9  400-03 (1991); *Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003); *Arreguin v.*

10 *Prunty*, 208 F.3d 835, 837 (9th Cir. 2000).  Such an error, if it occurs, is subject to

11 "harmless error" analysis.  *Neder v. United States*, 527 U.S. 1, 8-11 (1999).  On federal

12 habeas review, the error will be found harmless unless it "'had substantial and injurious

13 effect or influence in determining the jury's verdict.'"  *California v. Roy*, 519 U.S. 2, 4

14 (1996) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

15 Petitioner is correct that the language in the verdict form differs from the statute.

16 The different language does not misstate the elements of the offense, however.  As

17 discussed above, the California Court of Appeal determined as a matter of state law,

18 which is binding on this Court on habeas review, that the sentence enhancement is

19 broadly constructed to include tying or binding that occurred "before, during or after"

20 the oral copulations.  (Resp. Ex. E at 25.)  Therefore, Petitioner would fall within the

21 purview of the statute as long as Petitioner shackled J.B. and J.B. was shacked when the

22 copulations took place, just as the verdict forms stated.  As such, the verdict forms did

23 not misstate state law, or violate due process, despite using different language than the

24 statute.

25 In any event, any error in the verdict forms was harmless.  As the California Court

26 of Appeal correctly noted, Petitioner was given correct jury instructions on the elements

27 of the enhancement and the trial court instructed the jury to follow the instructions, not

28 the verdict form.  (Resp. Ex. A at 349, 382; Exh. B at 549-50, 566-67.)  Juries are

United States District Court

For the Northern District of California

1   presumed to follow the instructions given to them, *Weeks v. Angelone*, 528 U.S. at 234,

2   and the record is devoid of any indication that they did not do so here.  Even the

3   prosecutor urged the jury to follow the instructions.  (Resp. Ex. E at 27.)  As the jury

4   instructions correctly described the elements of the offense, any error in the jury form, di

5   not have a substantial and injurious effect on the verdict.

6        Accordingly, Petitioner is not entitled to habeas relief on this claim.

7   F.   CALCRIM No. 1191

8        In Claim 37, Petitioner argues that the trial court violated his right to due process

9   by instructing the jury pursuant to the model jury instruction CALCRIM No. 1191.  That

10  instruction guides the jury on the permissible use of the evidence of Petitioner's prior

11  uncharged acts of sexual contact with other minors.  (Ex. E at 27-28.)  This evidence was

12  admitted pursuant to California Evidence Code § 1108, which allows evidence of prior

13  sexual offenses to be admitted to show that the defendant had a propensity to commit the

14  charged sexual offenses.  (*Id.*)  CALCRIM No. 1191 informs the jury that if it finds the

15  prior offenses true by a preponderance of the evidence, this is "only one factor to

16  consider" in its determination of whether the defendant "committed each element of

17  every charge beyond a reasonable doubt."  (*Id.*)

18       Petitioner argues that the instruction led the jury to believe that it could find

19  Petitioner guilty of the charged offense based on a preponderance of the evidence.  As

20  noted above, due process requires the prosecution to prove every element of an offense

21  beyond a reasonable doubt.  *Winship*, 397 U.S. at 364.  The instruction does not permit

22  the jury to infer that it may convict a defendant solely based upon a preponderance of the

23  evidence, however, because it explicitly states that the "People must still prove each

24  element of every charge beyond a reasonable doubt."  The Ninth Circuit found that

25  similar language in CALJIC No. 2.50.01 (2002) is "unambiguous and makes clear" the

26  prosecutor's correct burden of proof.[10]  *Schultz v. Tilton*, 659 F.3d 941, 943-45 (9th Cir.

27

28       [10]CALJIC No. 2.50.01 (2002) also instructs the jury on the permissible use of
propensity evidence.

2011) (state court's upholding use of that instruction not contrary to or an unreasonable application of federal law).  As in *Schultz*, the instruction used here pursuant to CALCRIM No. 1191 did not unconstitutionally lower the prosecution's burden of proof or violate Petitioner's right to due process.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  March 25, 2014

JEFFREY S. WHITE
United States District Judge

United States District Court

For the Northern District of California

1        UNITED STATES DISTRICT COURT

2                  FOR THE

3         NORTHERN DISTRICT OF CALIFORNIA

4

5
   RODNEY KRALOVETZ,                    Case Number: CV11-01552 JSW
6
                Plaintiff,              **CERTIFICATE OF SERVICE**
7
        v.
8
   GROUNDS et al,
9
                Defendant.
10  _____/

11
   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.
12  District Court, Northern District of California.

13  That on March 25, 2014, I SERVED a true and correct copy(ies) of the attached, by placing
    said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
14  depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
    delivery receptacle located in the Clerk's office.

15

16  Rodney T. Kralovetz
    F79317
17  Pleasant Valley State Prison
    P.O. Box 8500
18  Coalinga, CA 93210

19  Dated: March 25, 2014

20                                      Richard W. Wieking, Clerk
                                        By: Jennifer Ottolini, Deputy Clerk
21

22

23

24

25

26

27

28

*United States District Court*
For the Northern District of California